1 ; .·  ; ;`.

<u>Kevin D. Bryant,</u> #D-56620      oRiginAl
Name and Prisoner/Booking Number

<u>Kern Valley State Prison</u>
Place of Confinement

<u>P.O. Box 5104</u>
Mailing Address

<u>Delano, CA 93216</u>
City, State, Zip Code

FILED

MAR 1 7 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

(Failure to notify the Court of your change of address may result in dismissal of this action.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

<u>Kevin Darnell Bryant</u>           )
(Full Name of Plaintiff)        Plaintiff,   )
                                )
                       vs.      )
                                )
<u>(1) C/o Gallagher</u>            ,  )
(Full Name of Defendant)        )
                                )
<u>(2) C/o Romero</u>              ,  )
                                )
<u>(3) Kelly Harrington</u>        ,  )
                                )
<u>(4) Matthew Cate</u>           ,  )
         Defendant(s).          )
☐ Check if there are additional Defendants and attach page 1-A listing them.  )

1: 11 CV 0 0 4 4 6    SKO  PC

CASE NO. _____
(To be supplied by the Clerk)

CIVIL RIGHTS COMPLAINT
BY A PRISONER

☒ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

## A. JURISDICTION

1.   This Court has jurisdiction over this action pursuant to:
     ☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
     ☐ 28 U.S.C. § 1331; <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971).
     ☐ Other: _____

2.   Institution/city where violation occurred: <u>Kern Valley State Prison, Delano, CA</u>

RECEIVED                              550/555

MAR 17 2011
CLERK
EASTERN DISTRICT COURT
OF CALIFORNIA
BY_____ DEPUTY CLERK

## B. DEFENDANTS

1. Name of first Defendant: C/o GALLAGhek . The first Defendant is employed as:
   A CORRECTIONAL OFFICER at KeRN VALLey State PRISON .
   (Position and Title)          (Institution)

2. Name of second Defendant: C/o ROMERO . The second Defendant is employed as:
   A CORRECTIONAL OFFICER at KeRN VALLey State PRISON .
   (Position and Title)          (Institution)

3. Name of third Defendant: Kelly HARRington . The third Defendant is employed as:
   The WARDEN at KeRN VALLey State PRISON .
   (Position and Title)          (Institution)

4. Name of fourth Defendant: MATthew CATe . The fourth Defendant is employed as:
   The SecRetARy / DiRectoR at CDCR MAIN HeAdquaRteRS .
   (Position and Title)          (Institution)

   "All defendants Are Sued iN theiR individuAL And officiAL cApAcity And
   they weRe Acting undeR coloR of StAte LAW."

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?      ☒ Yes      ☐ No

2. If yes, how many lawsuits have you filed? 3 + . Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: BRYANT v. GALLAgheR
      2. Court and case number: KeRN Co. Sup. CouRt, #S-1500-CV-272672-WDP .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Still Pending

   b. Second prior lawsuit:
      1. Parties: BRYANT v. CDCR & Does 1 - 100
      2. Court and case number: KeRN Co. Sup. CouRt #S-1500-CV-272692-WDP .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Still Pending

   c. Third prior lawsuit:
      1. Parties: BRYANT v. C/o SpARKS
      2. Court and case number: KeRN Co. Sup. CouRt #S-1500-CV-272512-WDP .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Still Pending

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

## D. CAUSE OF ACTION

### COUNT I

1. State the constitutional or other federal civil right that was violated: My Right to be free from Cruel And Unusual Punishment

2. **Count I.** Identify the issue involved. Check **only one.** State additional issues in separate counts.

   ☐ Basic necessities     ☐ Mail     ☐ Access to the court     ☐ Medical care

   ☐ Disciplinary proceedings     ☐ Property     ☐ Exercise of religion     ☐ Retaliation

   ☐ Excessive force by an officer     ☐ Threat to safety     ☒ Other: Assault & Battery by Officers.

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what each Defendant did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   ON 6-8-10 Officers Gallagher And Romero intentionally planned, Aided And Abetted in the Assault And Battery of plaintiff causing severe bodily inJury in Retaliation for A inmate grievance I filed the day before where officer Gallagher stated to me that he was going to have the portel & MAC Rep inmates to get me. ON 6-8-10 officer Romero went up into the building control booth, let several MAC Rep inmates come into this building (who did not live in this building) And told them to Assault And Batter me then threaten me to be silent About it. At 12:30 p.m. officer Romero opened my cell door, told me to come out for work. He had several inmates there in the day Room waiting for me. He stood there in the control booth And watched them Attack me And he did not press the Alarm or do Anything to stop them. During this Attack I suffered A compound fracture of my Right leg, A fracture of my Right Arm And hand And swollen black eye. Then officer Romero conspired to cover up his crime. He let those inmates leave out the building And Refused to call the clinic to get me medical care. My hand & Right Arm is still injured And Medical staff here Refuse to give me medical care for this. I need A writ to find the damage & injury.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

   Romero & Gallagher threatened me, planned the Assault of me, Aided & Abetted the Assault And I suffered several broken & fractured bones, severe mental And physical stress, had to have 3 surgeries with metal plates & screws in leg.

5. **Administrative Remedies:**

   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    ☒ Yes   ☐ No

   b. Did you submit a request for administrative relief on Count I?    ☒ Yes   ☐ No

   c. Did you appeal your request for relief on Count I to the highest level?    ☒ Yes   ☐ No

   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

## COUNT II

1. State the constitutional or other federal civil right that was violated: My Right of Due Process And equal protection under the Law.

2. Count II. Identify the issue involved. Check **only** one. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☒ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what each Defendant did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

Defendants Kelly Harrington and Matthew Cate bleached their duty to protect me from these rogue officers who set me up to be assaulted. They both knew of and disregarded the risk to my safety and they conspired to cover-up these officers prior criminal acts of harming inmates and this assault & battery on me. There have been dozens of Appeals, staff misconduct complaints and Internal Affairs investigations on these two officers for this exact same type of criminal assault and defendants Harrington and Cate knew of these and both conspired to supress and cover them up. They never disciplined them or did anything to deter their criminal conduct. This is a clear pattern of their condoning this custom and unwritten policy. Prison officials are afraid of these officers union the CCPOA. They clearly allow and condone this custom and policy of criminal assaults of inmates. Because of their prior knowledge of these two officers violent pattern of criminal abuse defendants Harrington and Cate are also equally responsible for all my injuries and damages at the hands of defendants Gallagher & Romero. Due to their pattern of continued abuse they had forknowledge that another inmate would be injured by these officers and that inmate happens to be me. And to this day they have not done anything to fix the problem of discipline these officers.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
By their failure to act or even discipline these officers after the first dozen times they criminally harmed inmates they placed me in inevitable and fore-knowledged danger of sever injury.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count II?  ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Count II to the highest level?  ☒ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

## COUNT III

1. State the constitutional or other federal civil right that was violated: RetAliAtoRy TReAtment foR FilinG ToRt ClAim And foR filinG gRievAnces And thReAts of moRe induRies.

2. Count III. Identify the issue involved. Check only one. State additional issues in separate counts.

   ☐ Basic necessities     ☐ Mail     ☐ Access to the court     ☐ Medical care

   ☐ Disciplinary proceedings     ☐ Property     ☐ Exercise of religion     ☐ Retaliation

   ☐ Excessive force by an officer     ☒ Threat to safety     ☐ Other: _____

3. Supporting Facts. State as briefly as possible the FACTS supporting Count III. Describe exactly what each Defendant did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

My life is now in gRave And iminent dangeR of RetAliAtion And Revenge fRom the defendAnts GAllagheR, RomeRo And the otheR officeRs heRe who ARe theiR fRiends And cowoRkeRs, I hAve Received RepeAted thReAts fRom seveRAl officeRs heRe. The SeRgeAnts And LieutenAnts ARe veRy hostile towARds me. I wAs plAced in Ad-Seg on 11-30-10 oveR five months AfteR the AssAult. On 12-4-10 I wAs ReleAsed fRom Ad-seg to A diffeRent yARd Allegedly to pRoteat me fRom RetAliAtion fRom these two defendAnts. The sAme officeRs continuAlly woRk this yARd too And I hAve witnessed them pointing me out to theiR officeR fRiends heRe on D-yARd. While in Ad-Seg A officeR stAted to me, "You ARe gonnA get youRs snitch" on 12-1-10. On 12-6-10 one officeR Asked me "if I hAve A will" then sAid "I'm gonnA need one". On 12-9-10 A officeR told me "they will get me no mAtteR wheRe I'm At." These thReAts hAve continued to the pResent dAte And they ARe Just wAiting until the heAt dies down to tRy to huRt oR Kill me. A officeR told me thAt if I get those officeRs into tRouble "I will be in tRouble.

4. Injury. State how you were injured by the actions or inactions of the Defendant(s).

BecAuse of my RepoRting whAt hAppened to me on 6-8-10 my life is in dAngeR And I Am in iminent dAngeR of hARm And RetAliAtion fRom Any of the officeRs heRe At this pRison.

5. Administrative Remedies.

   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?     ☒ Yes    ☐ No

   b. Did you submit a request for administrative relief on Count III?     ☒ Yes    ☐ No

   c. Did you appeal your request for relief on Count III to the highest level?     ☒ Yes    ☐ No

   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.

5

## COUNT IV

1. State the constitutional or other Federal civil Right that was violated: Police Misconduct in violation of the RICO Act.

2. Count IV. Excessive Force by an Officer

3. Supporting Facts:

CDCR officers are police officers as they are all members of the CCPOA and the LEO union. This is organized crime by these officers and the CDCR's top officials conspiracy to cover up their criminal acts, and shielding them from prosecution. And because of the barriers to prosecution of police corruption and inappropiate behavior, civil RICO is a useful and appropriate tool in the fight against police misconduct. This District court is aware of the innumerable allegations of police misconduct of these CDCR officers and all the barriers, obstacles and obstruction they use to deter and prevent inmates ability to receive adequate redress of grievances. They withhold discovery and evidence of these criminal acts, they use threats, intimidation and violent physical retaliation against anyone who files grievances or oposes these practices. This court knows of these allegations and practices and I request this court to now draw the line and allow me to proceed against these defendants and their employer under civil RICO. This is organized crime at its worse when its the police officers who are the perpetrators. Their history of extreme criminal conduct is my grounds for this count and the reason it should be allowed. I'm being threatened by these and other officers here to scare me into dropping this.

4. Injury.

Because of my reporting what happened to me on 6-8-10 and the criminal conspiracy to cover it up by prison officials and the repeated threats of retaliation by these defendants and their employer and my severe injuries I'm suffering severe mental and physical stress.

5-A

## COUNT V

1. State the constitutional or other federal civil right that was violated: My right to Due Process, Equal Protection of Law, and Discrimination and Impairing the obligation of Contracts.

2. Discrimination in several PLRA Restrictions Unconstitutional

3. Supporting Facts:

We the people, prisoners included are all equal under the law, and the Restrictions of the PLRA are unconstitutional and must not be applied or enforced in this case. Placing any cap on the amount of damages I can be awarded is pure and unlawful discrimination as I am the same form of human being as a non prisoner and no cap is placed on non prisoners. Discrimination is unlawful under federal law and unconstitutional and no state shall... pass any law impairing the obligation of contracts. So if I make a contractual agreement with defendants through dishonor or default for an award of damages thats much higher than the illegal PLRA cap, this court must support, enforce and uphold it. Because all Judicial officers of this court are bound by oath or affirmation, to support the u.s. constitution and any thing in the laws of any state to the contrary notwithstanding. The constitution, not the PLRA is the supreme law of the land. This PLRA award cap further discriminates by keeping good attorneys and high powered expensive law firms, the better firms, from even considering taking a prisoners case. And this court is bound not to enforce that and support my constitutionally protected unalienable Rights without fail. So there can be no cap on my damage award or my ability to contract thereto. And any other unconstitutional PLRA provisions that may be brought up by defendants must also be prohibited.

4. Injury.

Any implementation of the above mentioned PLRA in this case is unconstitutional and will further injure me and damage me and I do not consent to any of its provisions and Jurisdiction in this case. Consent not given and permission is denied indefinately.

5-B

## COUNT VI

1. State the constitutional or other federal civil right that was violated: My right to medical care for all the injuries I suffered in this attack and their deliberate indifference thereto

2. Medical care

3. Supporting facts:

During this assault and battery my right hand and right arm at the elbow were severely fractured also, and to this very date they refuse to provide me medical care therefor. They refused to even provide an x-ray of these injuries for over 6 months. They now claim the x-ray shows no broken bones so they don't have to do nothing else. My right hand and right elbow is in severe pain constantly and I cannot even fully use it. The fractures must have healed wrong or something because something is definately wrong with it. I've repeatedly asked Dr. Patel & Dr. Schaefer to order a MRI or CT scan done on both my hand and elbow but they refused. They stated that they are not spending any more money on these injuries if the x-ray does not show a break. They would have seen the break if they had x-rayed it 8 months ago when it happened. I am injured because these defendants conspired to have me assaulted, and they refuse to even try to diagnose whats wrong with my right arm and hand for 8 months. I have suffered severe pain and limited use of my right hand and arm for 8 full months and medical staff here refuse to provide me any medical care for it or any adequate pain meds to alleviate the pain.

4. Injury.

I have severe pain & very limited use of my right hand and arm and they have waited over 8 months and let my fractures heal wrong and is now partially disabled.

5-C

## E. REQUEST FOR RELIEF

State the relief you are seeking:

1. A Preliminary Induction, Protection Order and permanent TRO against these officials and this prison. 2. Compensatory damages of $2,000,000.00 Jointly & Severally against defendants Gallagher & Romero and $1,000,000.00 Jointly & Severally against defendants Harrington & Cate. 3. Punitive damages of $5,000,000.00 against all defendants Jointly & Severally to be covered by the Surety Bonding of CDCR Required by State law and full disclosure of all provisions thereof. 4. Immediate transfer to RJD prison Level III. or MCSP Level III to protect me from the threats of Retaliation I received here. 5. Allow me to add CDCR as a defendant on Count III RICO and proceed. And, *

I declare under penalty of perjury that the foregoing is true and correct. All Rights Reserved

Executed on ___2/24/2011___
                        DATE

_Kenneth O. Bryant_
SIGNATURE OF PLAINTIFF
Sovereign, Secured Party,
Creditor

___PRo se Attorney-in-fact___
(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
_____
_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space, you may attach no more than fifteen additional pages. But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

* 6. A preliminary Induction ordering CDCR to Immediately have a MRI or CT scan done of my right hand and right arm at the elbow to try to determine whats wrong with it.

6
6

## Affidavit

I, the Affiant, certify and affirm on my own commercial and personal liability that I am the maker of this Complaint, and I have read the foregoing and know the contents thereof, and that to the best of my knowledge, understanding and belief, it is True, correct, complete and not misleading, the Truth, the whole Truth and nothing but the Truth so help me God.

And, should the defendants or any party hereto consider my position in error, and desire to Rebut my factual and conclusive claims herein, you must do so in the same manner of this Affidavit, with a notarized Affidavit of your own attesting to all the facts and claims therein and using your Christian or family name thereupon for the signature affirming your own commercial and personal liability thereby and thereto, and make a legal and proven service thereof upon Plaintiff as required by court rules.

And if defendants or any party hereto does not Rebut this Complaint in their answer or their own Affidavit and exactly as stated above, and serve it upon Plaintiff, you hereby waive all presentment(s), Notices of fault, default and opportunities to cure your acceptance, notices of non-response, dishonor, protest and you are in full agreement of all the claims in this Complaint as they operate in Plaintiffs favor and you are estopped from any and all opposition thereto and from any of the facts therein indefinitely and this is the binding and contractual agreement of all parties hereto including their employer, agents, partners known and unknown and their legal counsel.

Further Affiant Sayeth Not.

Dated this 25th day of February, 2011.

with Reservation of all my Rights, and without prejudice to any of my Rights.

/S/ Kevin D. Bryant
Kevin D. Bryant, Affiant & Pro Se Plaintiff

6-B

# EXHIBIT COVER PAGE



EXHIBIT

## DESCRIPTION OF THIS EXHIBIT

Los Angeles Times Article by MARK ARAX ON the Criminal Conduct involved in CDC

## NUMBER OF PAGES TO THIS EXHIBIT: ___5___ PAGES.

JURISDICTION: (Check only one)

☐ Municipal Court

☒ Superior Court

☐ Appellate Court

☐ State Supreme

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

7

roved for
vith Judicial
ncil forms
997.

EXHIBIT "A"

# Guard Challenges Code of Silence

He says his efforts to combat brutality against prisoners hit a 'Green Wall.' He is set to testify before a panel today.

By MARK ARAX
Times Staff Writer

Among the ranks of prison guards, only the most trusted are chosen to open a new penitentiary and lay down the law to the first busloads of inmates.

Three times in a 15-year career, D.J. Vodicka got the call. He helped inaugurate Corcoran, Calipatria and Salinas Valley — not a country club lockup among them, he liked to say.

At 6 feet 6 and 280 pounds, with a head shaved clean, he was a guard's guard. "Vodicka was one of the most professional guys I ever had the privilege of supervising," said Joe Reynoso, a longtime corrections investigator. "Just a stand-up, straight-up officer."



MEL MELOON Los Angeles Times

BREAKING THE CODE: D.J. Vodicka, 41, will testify today before a state Senate committee on prison reform.

Today, Donald Joseph Vodicka will stand before a state Senate committee on prison reform not as a guard but as a whistle-blower. Instead of a career marked by commendations from wardens and prosecutors, the 41-year-old Vodicka is set to testify about how he had to put away his green uniform after breaking what he calls the cardinal rule of guards: Keep quiet in the face of officer brutality and corruption.

Some of his old co-workers now call him a "rat," a "snitch," a "crybaby." The state correctional officers union, a strong advocate for guards, won't have

[See Prison, Page B6]

8

# Prison Guard Att

[Prison, from Page B1]

anything to do with him.

The code of silence, he says, isn't simply a way to instill a fraternal bond among men who come face-to-face with California's most violent criminals. Rather, it remains a bigger-than-life force that nurtures rogue guards, reckless wardens and a union that holds too much influence over the state's prison system.

"The code of silence among correctional officers is a way of life," Vodicka said. "It's everywhere. It was strong at Corcoran and Pelican Bay, and it even took hold at Salinas Valley.

"A whistle-blower has no place to hide. Why should someone come forward when he knows he's not going to be protected by the Department of Corrections or his union?"

For years, the California Correctional Peace Officers' Assn. has denied that the code of silence is a form of unconstitutional intimidation. It isn't some malice lurking everywhere, union officials say, but the modus operandi of a few bad officers.

But state Sen. Jackie Speier (D-Hillsborough), who will head the committee's hearings on prison reform over the next several weeks, said the Department of Corrections, despite a call for change in the late 1990s, still thwarts whistle-blowers. As a result, the impulse to keep silent is deeply ingrained.

"We have a system so sinister and powerful that it is able to muzzle people who want to tell the truth," Speier said. "Those who do come forward like Mr. Vodicka find themselves sent to a job in the prison's Siberia, or fearing for their lives."

In a lawsuit filed against the state, Vodicka alleges that he blew the whistle on a gang of officers known as the "Green Wall" at Salinas Valley State Prison and was the subject of retaliation by co-workers and superior officers. The lawsuit contends that the Department of Corrections failed to shield Vodicka under the state's whistle-blower protection law. The department, citing the lawsuit, declined to comment.

"Instead of following up on his memos, high-ranking officers leaked his information to guards and talked about him being a 'rat' in 'front' of inmates," said Lanny Tron, a Camarillo attorney representing Vodicka. "He fears for his life."

Vodicka grew up in Camarillo, the middle son of a power company executive. He wanted to become a cop, but the waiting list was too long. Corrections was a temporary fill-in, or so he thought.

After his superiors chose him to open Corcoran State Prison in 1988 and Calipatria State Prison in 1992, Vodicka took a job at the troubled Pelican Bay. Several guards there were directing a group of inmates to stab and beat other prisoners, many of them convicted child molesters. The prison's internal affairs team, despite intense opposition from the union and high-ranking corrections officials, pursued the rogue officers with the help of Vodicka.

The Del Norte County district attorney's office, which won convictions against the ringleaders, cited Vodicka for meritorious service. Pelican Bay Warden Steven Cambra said he regretted seeing Vodicka transfer to a new state prison in Salinas Valley. "I am certain you will become a valuable asset wherever you go," he wrote.

## Burned Out

Vodicka focused on inmate crimes as a member of Salinas Valley's Investigative Services Unit. Then in 1998, he found himself burned out. "I decided to leave ISU and return to the line," he said.

The transition wasn't easy. He was an internal-affairs guy, and line officers viewed him with distrust. The suspicion grew after an incident on Thanksgiving Day 1998 in the D yard, in which a gang of inmates attacked and injured several officers.

Lt. Greg Lewis was assigned to oversee the yard that day, Vodicka said in an interview. Lewis suspected that some officers would seek revenge against the inmates, Vodicka said, and

9

# empts to Tear Dow



**WHISTLE-BLOWER:** Danny Tron, left, a Camarillo attorney representing D.J. Vodicka, says his action feared for his life in a lawsuit. Vodicka says he was the subject of retaliation.

he assigned Vodicka to handle the crime scene. Vodicka photographed the inmates to documentary injuries suffered in the initial fight.

The officers were upset at me for doing that, Vodicka said. They already knew they were going to beat them up. They didn't want my photos to establish a baseline.

As the inmates were taken to a segregated cellblock, Vodicka said, they were roughed up. In the weeks that followed, a group of officers began wearing turkey-shaped pins on their uniforms as a symbol of the Thanksgiving beating. Word then spread that some of those same officers and others had formed the Green Wall gang.

Numerous attempts to contact alleged members of the Green Wall, other guards named in the lawsuit and the assistant attorney general representing the state were unsuccessful. Repeated phone calls seeking interviews were not returned. A spokesman at Salinas Valley State Prison referred all ques-

tions to the corrections press office in Sacramento, which also declined to comment because of the pending litigation.

In an internal memo attached to the lawsuit and obtained by The Times, Lewis wrote to superiors that the Green Wall reached deep inside Salinas Valley's investigative unit. Some ISU officers were signing in with green ink. One officer wore a green band on his left wrist, according to the memo, and his motorcycle license plate reportedly contained the symbol "7/23." The seventh and 23rd letters of the alphabet — G and W — stood for Green Wall.

Officers were throwing parties in Soledad with green beer and green attire. A group photo showed several officers flashing the same sign: three fingers extended with thumb and middle finger held down — in the shape of a W.

Officer gangs can be vehicles to strengthen the code of silence and cover up wrongdoing. But Lewis had a hard time getting anyone above him interested,

# n 'Green Wall'

the internal memos show. And when a state corrections investigator finally did show up, he walked around with a union leader, ensuring that no officer would talk about the gang.

Frustrated, Lewis approached Vodicka and asked him to write a memo on what he knew about the Green Wall, according to the lawsuit. Vodicka hesitated at first, knowing the retaliation that whistle blowers had received at Corcoran. Vodicka said Lewis pressured him some more, and he relented.

"I put in all the little signs I had seen, the stuff that showed a Green Wall existed," he said. "At one one officer flashed a gang sign in front of me, two did a second memo.

Vodicka noticed that the officer and others began treating him coldly, turning silent whenever he entered the room. He figured word had been leaked of his cooperation. But it wasn't until he wrote a third memo several months later that the hostilities became apparent, according to the lawsuit.

Several officers had violated policy by bringing a green-handled knife into the prison and presenting it to a colleague who had just been promoted. The knife had been engraved with "Green Wall" and "7/22," according to the internal memos.

One night, an agitated Lewis invited Vodicka to his house. He said he had gone to warden Anthony Lamarque about the knife incident, but the warden refused to deal with the situation.

Lewis was so upset that two days later he abruptly left the prison and transferred to another facility.

That's when Vodicka wrote the third memo, detailing his conversation with Lewis and the knife incident. He submitted the memo to a supervisor, who promised that he would send it as a confidential matter to Sacramento. But two months later, according to court documents and interviews, the memo's contents had been leaked to other line officers.

The consequences for Vodicka were immediate. Steve Archibald, one of several officers

who had been removed from the Investigative Services Unit in a housecleaning, confronted Vodicka. Archibald talked about the contents of the confidential memo and blamed Vodicka for his job change.

"I couldn't believe that my memo had been leaked by a captain. A week later, on the yard, another officer came up to me and said that Archibald was bad-mouthing me to other officers."

## Hostile Environment

That a hostile work environment now existed was confirmed in a separate memo written by Sgt. L. J. Gomez, who informed Vodicka that several officers were calling him a "snitch" behind his back.

Vodicka won a transfer to Pleasant Valley State Prison in February 2002, but the intimidation only grew, he says. His lawsuit alleges that one lieutenant revealed the reason for his transfer. "You big old snitch. You big old rat," he quotes the lieutenant as telling him. The lieutenant then repeated the words on the yard — in front of officers and inmates.

"He'd pick up the phone and say, 'I've got the FBI on the line. Who'd you want to tell on now?' I knew there was no escaping. No matter what prison I transferred to, this was going to follow me."

Vodicka took a stress leave of a year ago and filed a workers' compensation claim.

He and his attorney wrote letters detailing each hostile encounter — to internal investigators in Sacramento, Corrections Director Edward Alameida, the inspector general's office, and then-Gov. Gray Davis. As one official passed the buck to another, Vodicka sought out the help of the union. He said Mike Jimenez, the union president, refused to talk to him.

"It was the worst hurt of all," he said, learning that his union considered him a "pariah."

"The CCPOA washed its hands of me," he said. "They wanted no part of an officer who reports wrongdoing. I didn't deserve representation in their eyes."

# ACTIVISM WILL END THE SHUs

*By Charles Carbone*

Many SHU prisoners and their supporters have long known that the goal of closing the SHUs is likely not to occur solely in the courts or via legislation—at least not as the initial impetus of such changes.

Thankfully, recent efforts are underway for a political movement led by former prisoners and human rights advocates to close the SHUs through education and mobilization of the public. In a series of coordinated state-wide meetings and actions, several groups have coalesced to draw attention to the inhumanity of the SHUs. The groups include the Barrio Defense Committee out of San Jose, CPF, MIM, and a number of student activists who have led coordinated regional meetings to develop a state-wide plan of action to close the SHUs. From these efforts monthly community education campaigns were initiated to properly educate and inform the public on the ills of long-term isolation in California's prisons. Once a month these groups target various California cities, including Los Angeles, San Diego, Oakland, and Santa Cruz to inform average citizens, many of whom are unaware of the use of the SHUs in California and their cost to the prisoners, public safety, and the taxpayer.

Through these efforts organizers have learned two simple lessons so far. One, most Californians of the existence and reliance on the SHUs, and second, once informed the vast majority of Californians express their disgust and dismay at the barbarism of these practices. These lessons provide critical insight for they teach us that the California voting public is on our side once they peer inside the realities of DoC's love affair with torture and its impact on our state.

The monthly education effort has been a successful that plans are underway for a state-wide conference devoted to drawing further attention to the issue of the SHUs. These conferences will draw from a wide range of prisoners, family members, attorneys, activists, and others to accomplish short and long-term goals of education I most importantly mobilization ause mere education without action is enough. Actions are sure to include violent political demonstrations as well as building alliances with other prisoner rights organizations in California and the rest of the nation.

It is our hope that these efforts will blossom into a sustained, diverse, and effective strategy for realizing the closure of the SHUs. Here at CPF we welcome input from prisoners on your thought for building a political campaign to address your rights and the efforts undertaken thus far.



## NINE GUARDS FIRED FOR BEATING PRISONER

Nine correctional officers at Salinas Valley State Prison were fired recently in connection with the beating of an inmate last year, and for covering up the incident, a newspaper reported Wednesday.

The California Department of Corrections confirmed that "several" prison employees "have been served with adverse actions" at the Monterey County prison, spokeswoman Terry Thornton said.

A former Salinas Valley warden and top-ranking union officials both said the nine officers had been fired, and an anonymous source told The Sacramento Bee that a 10th officer was demoted as a result of the internal investigation.

Over the past three years, the prison has been the subject of numerous investigations by the Department of Corrections and the Office of the Inspector General into a small group of employees who called themselves the "Green Wall."

Ed Caden, former warden of the prison, told the Bee that the guards were fired after the November 2003 battery of an inmate, and not because of any investigation into the "Green Wall."

However, three of the officers who were fired had previously been implicated as members of the Green Wall, Caden said.

The disciplinary action stemmed from an incident that started when an inmate refused to come out of a "walk alone" cage in the exercise yard outside the administrative segregation housing unit at Salinas Valley, Caden said.

The cages are monitored by video cameras operated by officers in a control booth, department sources told the Bee. But before the officers responded to extract the inmate, one of them instructed the control booth officer to turn off the camera.

Officers then stormed the cage to get the inmate out, at which time the unidentified prisoner was knocked to the ground and kicked, according to Caden. The inmate had some red marks on his face as a result of the confrontation, but did not require medical treatment, Caden said. The nine officers were disciplined both for the alleged excessive use of force on the inmate and for failing to file any reports on the incident.

Caden was serving as the chief deputy warden at Salinas Valley at the time of the incident, but he said he did not find out about it until this past February, when he was named interim warden of the prison.

"I found out, and we immediately began an investigation," Caden said.

Caden served as interim warden until August. He has since retired.

California Correctional Peace Officers union Vice President Lance Corcoran confirmed the nine Salinas Valley officers had been fired, but he did not have any other details. Former CCPOA President Don Novey said the firing of nine officers was "the largest I can think of. I've never heard of more."

In 1996, eight officers were fired for the rough handling of three dozen inmates getting off a bus at Corcoran State Prison. All those officers were later reinstated.

Correctional agency spokesman J.P. Tremblay said that the adverse actions taken against the Salinas Valley employees shows "we will not tolerate employee misconduct."

*Reprinted from: L.A. Times*

# EXHIBIT COVER PAGE



EXHIBIT

**DESCRIPTION OF THIS EXHIBIT:**

*Exact copy of the 602 Appeal I filed About My Assadlt. The 3rd one I submitted.*

**NUMBER OF PAGES TO THIS EXHIBIT:** *9* **PAGES.**

JURISDICTION: (Check only one)

☐ CDCR Administrative Appeal

☐ California Victim Compensation
   And Government Claims Board

☐ Municipal Court

☒ Superior Court

☐ Appellate Court

☐ State Supreme

☐ United States District Court

☐ United States Circuit Court

☐ United States Supreme Court

13

EXHIBIT "B"

prev'd for
with Judicial
mcd forms
1997

INMATE/PAROLEE
APPEAL FORM
CDC 602 (12/87)

| | Location: Institution/Parole Region | Log No. | Category |
|---|---|---|---|
| 1. | _____ | 1. _____ | |
| 2. | _____ | 2. _____ | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME Darnell Bryant | NUMBER D-56620 | ASSIGNMENT C3 Porter 2/W | UNIT/ROOM NUMBER C3-108 lower |
|---|---|---|---|

A. Describe Problem: This appeal is for a incident that happened on 6/8/10 and this is the "third"

602 Appeal that I have sent to this appeals office regarding this. I just found out from

Sergeant A. Sells, the OIA Sergeant why you haven't responded to my two prior appeals. The

C3 building officers have been obstructing and withholding those prior letters I have sent

to the appeals office and to the OIA & ISU Lieutenants regardint this matter in an attempt

to cover up what they did to me. I have the dates logged in my legal log book showing

every single correspondence I sent out to you and I sent the first 602 appeal to your

office on 6/17/10. When I did not receive any response from your office for over a month

If you need more space, attach one additional sheet.                    (continued on attached additional sheet)------->>>

B. Action Requested: I want to be compensated for my severe pain and suffering in the sum certain

One Million Dollars ($1,000,000.00), and Punitive damages in the sum certian One Million

Dollars, and that this amount be given to me immediately. I want full and complete

disclosure of "ALL" surety bonding information of CDCR in its entirety; and I want all

Inmate/Parolee Signature: _____    Date Submitted: 10/2/2010

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_____

_____

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed    14    CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

602 APPEAL FORM AGAINST C/O's GALLAGHER & ROMERO CATED 10/2/2010 CONTINUED

A. Describe Problem Continued:

I typed another 602 appeal on 7/18/10 and sent that one to the appeals office also. But as I stated before, I have just spoken to Sgt. A. Sells on 9/30/10 and i have discovered that the C3 building officers have been withholding these mailings to cover up what they did to me.

   I was set up to be jumped by several inmates by c/o's Gallagher and Romero on 6/8/10. This incident stemmed from my filing a 602 appeal on these two officers on 6/7/10 because they told me and the other barbers that we will not be let out for our job assignments until after 2:00 p.m. when our job assignments start at 12:30 p.m. I completed a 602 appeal about this on 6/7/10 and handed it to c/o Romero. When I came out for pill call c/o Gallagher gave me back the appeal and them he threatened to tell the other inmates and M.A.C. reps in this building that he is going to keep them locked down in their cells and that its all my fault. I told Gallagher and Romero that if they do that I will file a complaint with the Warden's office and tell them how they both just lay up in their office every single morning with the lights out asleep, and how they just sit around playing cards all afternoon until they get off work and thats why they don't want to let us out for work until the next shift. So they can sleep. And thats the truth.

   C/o Gallagher and Romero went and told the other inmate M.A.C. reps, porters and their personal henchmen they let run the building that I have done something to cause them to be locked down all day from now on and elicited them to jump on me. This is a fact and is just what happened. And c/o Romero & Gallagher helped them to jump me. The very next day after this 602 appeal and their threatening me, C/o Romero was the floor officer, "BUT" he decided to go up into the control booth just around 12:Noon where he let M.A.C. reps from other buildings come into this building and he had them all come over into "A" Section where I am housed. He told all of us barbers the day before that we will not be let out for work until 2:00 p.m. But at 12:30 p.m. he opened my door and told me to come out for work. Please note that he did not let any of the other barbers out for work at that time, just me.

   He had all the M.A.C. reps that he let in this building in this section waiting for me to come out. When I came out his henchman whom he lets run this building called me over to the table and all these inamtes surrounded me and told me that I am messing things up for them and that the c/o's Gallagher and Romero let them do anything they want to do and I better not report them for sleeping on the job or not letting the barbers out for work because they would still let them out no matter what. One of them hit me from the left side and knocked me down, and the other one in the wheel chair had his wheel chair foot pedals up close behind me so I would trip over them. Before they hit me this way I looked up and saw c/o Romero in the control booth watching the whole incident and he was telling Gallagher through the hole in the floor up there exactly what was going on. He watched them jump me and he did not do anything.

   The one that hit me from the side kept rushing me and I tried to get up and fight back but I couldn't stand well on my right leg, which I discovered was severely broken after this officer orchestrated attack was over. He attacked me all the way over to the A-section dayroom door to the rotunda and c/o Gallagher was in the office and he saw them attacking me too but he just sat there in the office with the light out and acted like he was asleep. I saw him through the office window looking. My cellie told me that he came up to the window at first when they started attacking me and was watching it for a few seconds then he turned and went back to the office, because when I got over to that door he was already back in his office.

   The M.A.C. reps and c/o Gallaghers henchman called me back into A-section    *15* stating that its over now and they are not gonna hit me no more, and he told me that the officers are not gonna help me as I can see and if I tell what happened or get any of them into trouble they would get me, and even if I get moved to another prison they would still get me. They even threatened to get my family on the street if I tell what happened. He said that Gallagher would give them the addresses off

2

of my mail or out of my CDC records and files. He said they will get me and my
family if I tell on Gallagher or Romero about their letting them jump me or about
their sleeping in the office all day and playing cards. He told me to say I slipped
in the water right there by the door and fell, and thats what I did because the
officers just showed me that they set this up and had me jumped.

. My right leg was severely broken and the bone punctured thru the skin, and I
could not walk at all on it. I called up to c/o Romero and told him my leg was broke
and to call the nurses to come get me. I showed him that my right foot was broken.
It was flippes over to the right side of my leg and you could see the bone punctur-
ing thru my leg, and I showed this to Romero who was right over me in the control
booth looking down at me. He was now very nervous and scared and he refused to call
the medical clinic at all. he told me to wait until the four p.m. pill call nurse
comes in three and a half hours later. Romero did not know what I was gonna do or
tell once I got up to the clinic or program office and thats why he did not want to
call medical or anyone. What he immediately did was tell all the M.A.C. reps that
didn't live in this building that they had to get out right now and he let them all
go out. Then he let all the M.A.C. reps in A-section go out the side fire door into
B-section, and I could not see where they went from there. Romero knew that he let
them come in there to jump me and they told them and elicited them to jump me
because I was gonna report them to the Warden for sleeping on the job.

I told the nurses and the doctors that I slipped and fell to protect my life
and my families lives. Romero did not call medical to come get me..He refused to do
that. I asked him to open my cell door and let me get my walker and go to the clinic,
because my leg was severely broken and bleeding where the bone came thru. I had to
hop on a walker all the way over to the clinic because Romero refused to call them
to come get me because he was probably scared I would tell on them for their
envolvement anyway.

. . My leg was so severely broken that they had to send me out to a Delano Hospital
right away. The very next day my whole leg blistered all the way around so bad
that when I went for surgery they cound not operate to fix my leg. I was in severe
pain so bad that I could barely stand it. They could not operate on my leg until
7/7/10, one month later when the blisters healed. On 7/7/10 I had surgery at
Mercy Hospital of Bakersfield on 7/7/10 and they had to re-set the bones, both the
tibia & Fibula, and they had to put a metal plate and eight screws into the smaller
of the two bones and two screws into the larger of the two bones. I was in severe
pain every second of every day and it was worse after the surgery. On 9/1/10
eight weeks later they did another surgery to remove the longer screws that went
thru both bones and put smaller screws into those holes. the plate and screws are
still in my leg and the doctor wants them to remain there to give it strength.

On 7/12/10 Lt.Stiles of Internal Affairs and Lt. Harden of I.S.U. had me
escorted over to their offices and asked me what really happened to my leg. Some-
body had obviously told them what had happened to me and why and they knew staff
was involved because O I.A. only investigates staff misconduct. They would not tell
me who told them what happened to me, but I wanted them to know to make sure its
known that I did not tell on them, because I don't want them coming after me or my
family. Somebody else reported this to them so I went ahead and told them the whole
story and I even let them copy the pages of my log book for that date where I
documented it all. These lieutenants recorded this whole interview on a little
digital recorder and they could possibly have video taped it too with a hidden ·
camera, I would not be suprised if they did. .

These Lieutenants told me that they are doing a investigation into this matter
on these officers and that I need to keep this to myself and not tell anybody at all.
I could not even file any 602 appeals or citizen complaints because these officers
would possibly find out. But I did want to wait. I knew that I had time limits and
I asked them to tell me when their investigation was done and that I wanted their

3   *16.*

final report to use to file a civil lawsuit against these officers. I even asked
them if they would testify in my behalf. I also asked them to make sure I was there
when they arrested Gallagher and Romero and escorted them out in handcuffs so I
could see it.

On 7/20/10 I sent a urgent request for interview to both Lt. Stiles and Lt.
Harden asking them to bring me over for an interview right away.  The C3 building
officers intercepted and withheld these letters so that they would not get them or
interview me. I also sent a seperate request in a regular legal mail envelope with
a stamp on it and sent it sealed and by the legal mail process to both of them, and
both these letters were withheld also. I know this because Sgt. A. Sells told me
on 9/30/10 that they have not received those letters.

On 7/25/10 I sent Lt. Stiles  and Lt. Harden both another request for interview
in seperate u-save-em envelopes and two  more in regular legal mail envelopes again
just like I did on 7/20/10 and they never received those either and I know this
also from my interview with Sgt. A. Sells.

I was writing to these lieutenants in order to find out when I could put in a
602 appeal and citizen complaints against these two officers for what they did to
me, but the C3 building officers intercepted all these and withheld them in their
attempt to cover up what they did. Internal Affairs are investigating what these
officers caused to happen to me and I was told that the warden has or will be
reviewint the reports and interviews that are done and then Sacramento will
be reviewing them next and them maybe Internal Affairs in Sacramento. I do not want
to jeopardize  their investigation in any way hy filing this 602 appeal but I need
to go ahead and file this so I can exhaust my administrative remedies and file
a civil complaint against these two officers.

I file this as a citizen complaint for staff misconduct and your appeals office
cannot screen this our sayint this is not illegal conduct warranting a citizen
complaint because Internal Affairs has already informed me that it is. Please
process this as a citizen complaint and please make sure that all digitally
recorded interviews into this matter done by OIA or anyone is saved and kept for
court litigation purposes because these officers committed a crime against me and
they should be prosecuted just like any other U.S. citizen would if they did this.


B. Action Requested Continued:


this info provided to me immediately under the California Public Records Act as is
required by law. I vant the Captain of C-facility and the the Associate Warden of
this complex to immediately order officers Gallagher and Romero to not speak to
any other inmates regarding my filing of the citizen complaint or anything regarding
it to protect my safety. This is warranted because of what they did to me before
and I need you to order them to not tell anyone about this and to not attempt to
set me up like this again. And please do not move me or disrupt my program for any
reason because I am not the problem.

17

EXHIBIT COVER PAGE

A

EXHIBIT

DESCRIPTION OF THIS EXHIBIT:

The 602 Appeal I gave c/o Romelo & Gallagher
on 6/7/10 that caused them to threaten me and
have me dumped.

NUMBER OF PAGES TO THIS EXHIBIT: ____/.____ PAGES.

JURISDICTION: (Check only one)

☒ CDCR Administrative Appeal

☒ California Victim Compensation
And Government Claims Board

☐ Municipal Court

☐ Superior Court

☐ Appellate Court

☐ State Supreme

☐ United States District Court

☐ United States Circuit Court

☐ United States Supreme Court

18

INMATE/PAROLEE
APPEAL FORM
CDC 602 (12/87)

| | Location: Institution/Parole Region | Log No. | Category |
|---|---|---|---|
| | 1. _____ | 1. _____ | _____ |
| | 2. _____ | 2. _____ | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Darnell Bryant | D-56620 | C3 Barber | C3-108 lower |

A. Describe Problem: Today, 6/6/10, we were told by c/o Gallagher that the building 3 barbers will not be let out for work until third watch. All barbers on this whole facility are let out for work at the time stated on our job ducats, 12:30 p.m. This is discrimination because if he changes our time to be let out he has to change it for every barber in this whole facility. Why is he trying to change our work hours anyway? As stated above I am giving this appeal to c/o Gallagher today for the informal level response before I submit this to the appeals office and file a citizen Complaint with the OIA and the Director of CDCR. I hope we can resolve this without having to do any further documentation.

If you need more space, attach one additional sheet.

B. Action Requested: I and All the other building 3 Barbers want to be let out for work at the time stated on our job ducats, 12:30 p.m.

Inmate/Parolee Signature: _____   Date Submitted: 6/7/2010

C. INFORMAL LEVEL (Date Received: 6/7/10 )

Staff Response: Granted.

Staff Signature: _____   Date Returned to Inmate: 6/7/10

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Signature: _____   Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed   19   CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
RIGHTS AND RESPONSIBILITY STATEMENT
CDCR 1858 (Rev. 10/06)

## RIGHTS AND RESPONSIBILITY STATEMENT

*The California Department of Corrections and Rehabilitation has added departmental language (shown inside brackets, in non-boldface type) for clarification purposes.*

*Pursuant to Penal Code 148.6, anyone wishing to file an allegation of misconduct by a departmental peace officer must read, sign and submit the following statement:*

YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER [this includes a departmental peace officer]   FOR ANY IMPROPER POLICE   [or peace] OFFICER CONDUCT. CALIFORNIA LAW REQUIRES. THIS AGENCY TO· HAVE A PROCEDURE ˌTO INVESTIGATE CITIZENS' [or inmates'/parolees'] COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY.   CITIZEN [or inmate/parolee] COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.

| COMPLAINANT'S PRINTED NAME | COMPLAINANT'S SIGNATURE | DATE SIGNED | |
|---|---|---|---|
| INMATE/PAROLEE PRINTED NAME | INMATE/PAROLEE'S SIGNATURE | CDC NUMBER | DATE SIGNED |
| Darnell Bryant | | ·D-56620 | 10/2/10 |
| RECEIVING STAFF'S PRINTED NAME | RECEIVING STAFF'S SIGNATURE | DATE SIGNED | |

DISTRIBUTION:
ORIGINAL ·
Public · Institution Head/Parole Administrator
Inmate/Parolee · Attach to CDC form 602
Employee · Institution Head/Parole Administrator
COPY · Complainant

Inmate/Parolee BOC Claim Release Form, from the claimant discharging the state from all future liability in said claim. The original shall be maintained in the institution/parole accounting office and the inmate/parolee shall be provided with a photocopy.

**54100.23         Conditions of Parole**

For inmates or parolees whose conditions of parole were established by the Department, reconsideration of the conditions of parole shall be submitted on a CDC Form 602 to the regional appeals coordinator of the region to which the case is assigned.

**54100.23.1         Contents**

Contents of the appeal:

* All appellant known citation points must be included in the same appeal.
* Specific reasons shall be stated and all necessary documents and information shall be attached to the request.
* The decision desired shall be stated.

**54100.23.2         Time Limits**

The appeal shall be filed at the second level of review (RPA) within 15 calendar days following receipt of the written confirmation of the decision and shall be processed per DOM 54100.12.

* The appellant, if dissatisfied with the second level of review, shall forward the appeal to third level.
* The appellant, if dissatisfied with third level of review, may then pursue the appeal per BPT Rules 2525 and 2526.

**54100.24         Reentry/Parole to County of Commitment**

**Appeals - Release**

Appeals on release to county of commitment shall not be accepted until the release program study (RPS) has been returned to the institution. The appeal shall be sent to the regional appeals coordinator where the RPS was completed, who shall route the appeal to the appropriate assistant RPA for first level review. The RPA shall conduct the second level review.

**54100.24.1         Denial of Reentry Placement**

Appeals on denial of reentry placement and/or assignments to specific work furlough locations shall be sent directly to the regional appeals coordinator from where the decision occurred. Institution caseworkers shall, upon receipt of all release program studies denying reentry placement, review and compare reasons for denial with factual information contained in the inmate's C-File. This review shall include a personal interview with the inmate and all information obtained shall be documented by the caseworker on a CDC Form 128-B. A copy of the CDC Form 128-B shall be attached to all reentry denial appeals by the inmate, prior to submission to the parole region. This action shall constitute the informal level review. The supervisor of the staff person who made the decision to deny placement, shall conduct the first level review. The Regional Administrator or designee shall conduct second level reviews.

**54100.24.2         Third Level (Director's Level)**

The appellant may, if dissatisfied, forward the appeal to third level.

**54100.25         Citizens' Complaint Procedures**

PC 832.5(a) requires the Department, as an employer of peace officers, to establish a procedure to investigate citizen complaints against this specific class of employee. This is in addition to established policy and procedures for handling complaints to non-peace officer staff.

**54100.25.1         Definition**

An inmate/parolee appeal that alleges misconduct by a departmental peace officer as defined in CCR (15) 3291(b) is considered to be a citizens' complaint. An inmate/parolee wishing to file a citizens' complaint shall utilize the existing departmental appeal procedure.

* Any person other than an inmate, parolee or Department employee who wishes to file a complaint alleging misconduct against a Department peace officer shall be advised to submit such complaint in writing to the WARDEN or RPA in charge of the location where the peace officer is employed.

**54100.25.2         Investigation**

Investigation of complaints alleging peace officer misconduct shall be conducted by an employee designated by the WARDEN or RPA.

* All investigations shall be conducted in accordance with inmate/parolee appeals procedures and in recognition of employee rights.
* Unless the alleged misconduct is of a criminal nature under investigation, the employee shall be notified of the complaint as soon as possible.

* Upon completion of an investigation involving non-inmate complaints, the investigative report shall be forwarded to the Warden or RPA for final review and approval.
* Inmate/parolee appeal investigative reports shall be processed in accordance with the departmental appeals procedure.

**54100.25.3         Written Responses**

Inmate and parolees shall receive written responses to their complaints pursuant to the departmental appeals procedure. Persons other than inmates and parolees shall receive a written response to their complaint from the appropriate WARDEN, RPA, or Chief Deputy Director (for headquarters peace officers). This response shall be completed within 30 days. When extraordinary circumstances prevent closure of an investigation within above time limits, the appellant shall be given written notification of the reasons for the delay.

**54100.25.5         Retention**

PC 832.5(b) requires the Department to retain citizen complaints and any related reports or findings for at least five years. Each Warden and RPA shall maintain a filing system containing copies of each citizen's complaint filed at that location during the last five years. This file shall include complaints by citizens other than the inmates/parolees and the written responses thereto as well as inmate/parolee appeals that allege peace officer misconduct.

* Records maintained pursuant to PC 832.5, Citizens' Complaints, or information obtained from such reports are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to EC 1043.

**54100.25.6         Wardens' and RPAs' Annual Report**

Each Warden and RPA shall prepare an annual report between January 1 and January 15 of citizens' complaints against peace officers. The report shall be submitted to the Chief, Inmate Appeals Branch.

**54100.25.7         Departmental Annual Report**

The Chief, Inmate Appeals Branch, shall prepare an annual report of all departmental citizens' complaints against peace officers that incorporates the number of inmate/parolee complaints and those filed by other persons, to be submitted by the Chief Deputy Director to the Bureau of Criminal Statistics, State DOJ, before January 31 of each year.

* The report shall contain data indicating the number of complaints determined to be unfounded; the number sustained; and complaints identified as non-criminal, criminal (misdemeanor) or criminal (felony).

*Note:* Pursuant to PC 832.5(a), a written description of this procedure shall be available for dissemination to the public upon their request.

**54100.26         Processing of Completed Documents - Institutions**

After completing the first level review, the CDC Form 602, with the reviewer's decision, shall be returned to the appeals coordinator to be logged out, a C-File copy and appeals coordinator's copy made, and the original then returned to the inmate. The C-File copy shall be forwarded to the case records office for filing. This process shall be repeated at the second level review.

**54100.26.1         Paroles**

After completing the first level review, the CDC Form 602, with the reviewer's response, shall be returned to the parolee. Two copies of CDC Form 602 and response shall be forwarded to the parole region appeals coordinator; one for logging out purposes and the second to be routed to the case records office for filing in appellant's C-File. This process shall be repeated at the second level review.

**54100.27         Quarterly Appeals Report**

Facility and parole region appeals coordinators shall prepare a quarterly report on appeal volume, content, outcome, and operational change as a result of appeal actions. The CDC Form 1008, Inmate/Parole Appeals Quarterly Report and CDC Form 1099, Quarterly Appeals Report (Inmate Property), shall be submitted to the Chief, Inmate Appeals Branch, within ten working days following the end of each quarter.

The Inmate Appeals Branch shall audit this data and compile a report for distribution to departmental administrators and to the courts upon request.

**54100.28         Inmate Assistance in Pre-Formal Appeal Resolution**

Approval is granted by the Department to utilize the assistance of an inmate in attempting to resolve potentially formal appeal concerns prior to official filing. This approval is restricted for use in minimum custody (level 1) facilities.



# EXHIBIT COVER PAGE

EXHIBIT

## DESCRIPTION OF THIS EXHIBIT

Los Angeles Times Article by MARK ARAX ON the
CRIMINAL Conduct involved in CDC

## NUMBER OF PAGES TO THIS EXHIBIT: ____5____ PAGES.

*Removed is
Duplicate of
pages 8-11*

JURISDICTION: (Check only one)

☐ Municipal Court

☐ Superior Court

☐ Appellate Court

☐ State Supreme

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

22

oved for
vith Judicial
icil forms
997.

# EXHIBIT COVER PAGE

$\mathcal{O}^{\mathcal{U}}$

EXHIBIT

## DESCRIPTION OF THIS EXHIBIT:

Medical Reports & Papers from Mercy Hospital and The doctor who performed my three surgeries.

## NUMBER OF PAGES TO THIS EXHIBIT: _16_ PAGES.

## JURISDICTION: (Check only one)

☐ CDCR Administrative Appeal

☐ California Victim Compensation
And Government Claims Board

☐ Municipal Court

☒ Superior Court

☐ Appellate Court

☐ State Supreme

☐ United States District Court

☐ United States Circuit Court

☐ United States Supreme Court

23

EXHIBIT "C"

CDC# D56620

Delano Regional Medical Center
1401 Garces Highway
Delano, CA 93215
(661) 725-4800

Patient: Bryant , Darnell
MR # / FIN #: 6024417 / 20222182
DOB / Sex: 03/26/1965 / Male
Attending: Vladimir Skorokhod, M.D.
Location: Emergency Department / /

## Diagnostic Radiology

**Accession Number**   **Exam**
XR-10-0010907          XR Ankle 2 Views Right

**Exam Date/Time**           **Ordering Physician**
06/08/2010 18:35 PDT         Vladimir Skorokhod, M.D.

## Reason For Exam

Ankle Fracture

## Report

Right ankle, AP and lateral view through splint

HISTORY:
Ankle Fracture.

FINDINGS:
There is an acute bimalleolar fracture with mild widening of the
medial ankle mortise

Talus is slightly displaced laterally. The ankle is immobilized in a
radiolucent posterior splint.

IMPRESSION:
Bimalleolar ankle fracture.
The medial malleolar fracture component extends through the distal
anterior tibia.
Mild widening of the ankle mortise with lateral displacement of the
talus.

**Accession Number**   **Exam**
XR-10-0010896          XR Ankle Complete Right

**Exam Date/Time**           **Ordering Physician**
06/08/2010 16:15 PDT         Vladimir Skorokhod, M.D.

## Reason For Exam

Ankle Pain

## Report

HISTORY: Pain, injury, and right ankle 6/8/2010

FINDINGS: Fracture subluxation right ankle with talus subluxed
laterally. Oblique fractures medial and lateral malleolus angulated
and displaced laterally. Posterior elements also fractured lateral

Legend:    * = Comments or Corrections    A = Abnormal    C = Critical    L = Low    H = High

Laboratory Director: Debra A. Hanks, M.D.
Print Date / Time: 06/09/2010 11:22

24

Chart Request ID: 14478895
Page 1 of 2

FROM: UNRC - MEDICAL RECORDS 661 721 5246 06/08 16 11:21 #533 P.003/000

Delano Regional Medical Center
1401 Garces Highway
Delano, CA 93215
(661) 725-4800

Patient:  Bryant , Darnell
MR # / FIN #: 6024417  /  20222182
DOB / Sex: 03/26/1965  /  Male
Attending:  Vladimir Skorokhod, M.D.
Location:  Emergency Department / /

## Diagnostic Radiology

**Accession Number**          **Exam**
XR-10-0010896          XR Ankle Complete Right

**Exam Date/Time**          **Ordering Physician**
06/08/2010 16:15 PDT          Vladimir Skorokhod, M.D.

view.

IMPRESSION: Trimalleolar fracture-dislocation right ankle as
described.
***** Preliminary Report *****

Dictated:  06/09/2010 09:52          Eric P. Hoffman, M.D.

Legend:          * = Comments or Corrections          A = Abnormal          C = Critical          L = Low          H = High

Laboratory Director:  Debra A. Hanks, M.D.          Chart Rquest ID: 14478895
Print Date / Time:  06/09/2010 11:22          Page 2 of 2

# K.V.S.P
# COMMUNITY
# INPATIENT STAY

| FACILITY NAME: *MERCY HOSPITAL* | |
|---|---|
| NAME: *BRYANT, DARNELL* | CDCR#: *D57620* |
| DOB: *3/20/65* | ADMIT#: *5994* |
| ADMIT DATE: *6/10/10* | DISCHARGE DATE: *6/11/10* |

## You will find the following medical documents in this community stay:

o Discharge Summary
ø History & Physical
ø Physician's Orders
ø Physician's Progress Notes
ø Labs/Radiology
ø Consultations/E.R. Reports
o Other:_____

## For further information needed please contact one of the following:

Bakersfield Memorial             PH. #: 661-327-4647  *26*
Delano Regional Medical Center PH. #: 661-721-5244
Kern Medical Center              PH. #: 661-326-2661
Mercy Hospital-Bakersfield       PH. #: 661-632-5176
San Joaquin Hospital             PH. #: 661-395-3000

```
                                          CHW CENTRAL CALIFORNIA
J750390        J20875852                  MERCY HOSPITAL BAKERSFIELD
BRYANT,DARNELL D56620 OPTOUT              2215 Truxtun Avenue
J.5W           J.508-01                   Bakersfield, California 93301
MARINO,JEFFREY
```

Pol #: D56620
DOB: 03/26/65
Admit Date: 06/10/10

**INMATE EMERGENCY ROOM REPORT**

DATE OF ADMIT: 06/10/2010

CHIEF COMPLAINT: Fracture to right ankle, leg pain.

HISTORY OF PRESENT ILLNESS: Mr. Bryant is a 45-year-old prisoner who
states he tripped and fell 3 days prior to his arrival here. He
evidently had sustained a fracture to his ankle and had some sort of
cast placed on it but complains of an increase in pain to the area. He
rates is pain as 10/10 in intensity. He has no other complaints.

PAST MEDICAL HISTORY: Hypertension, hyperlipidemia, arthritis.

CURRENT MEDICATIONS: Bacitracin, aspirin, calcium carbonate, Neurontin,
hydrochlorothiazide, hydralazine, ibuprofen, mineral oil, omeprazole,
simvastatin, Tornalate, Tramadol.

ALLERGIES: NO KNOWN DRUG ALLERGIES.

FAMILY HISTORY: Non-contributory.

SOCIAL HISTORY: The patient is a prisoner. He denies any tobacco,
alcohol or illicit drug use.

REVIEW OF SYSTEMS: EXTREMITIES: Please see HPI. All other review of
systems are negative per patient.

PHYSICAL EXAMINATION: GENERAL APPEARANCE: Mr. Bryant is a 45-year-old
African-American male, well developed, well nourished, in no obvious
distress. CONSTITUTIONAL: Vital Signs: Temp: 98.1. Pulse: 67. BP:
140/83. Resp: 15. Pulse oximetry is 99% on room air, non-hypoxemic.
EYES: The pupils are symmetrical, and reactive to light. The
conjunctivae and lids appear grossly normal. ENT: The oral mucosa is
moist and appears normal. NECK: The neck is supple and the trachea is
midline. RESPIRATORY: Equal chest wall excursion. There are no
intercostal retractions or the use of accessory muscles with
respirations. Breath sounds are clear and symmetrical. There are no
wheezes, rales or rhonchi. CARDIOVASCULAR: The chest wall is normal in
appearance. The heart has a regular rate and rhythm. GASTROINTESTINAL:
The abdomen is soft and non-distended. There is no tenderness to
palpation, rebound or guarding. SKIN: There is no significant rash or
ulceration. NEUROLOGIC: Grossly normal/baseline. HEME/LYMPH: No
petechiae. MUSCULOSKELETAL: All extremities within normal limits
except for the right lower extremity. The patient has a posterior
splint with a wrap on it. It looks like he actually had a cast and it
has been bivalved and the top half taken off. He has severe bullous
compression disease to the skin to the lower anterior leg and top of his
foot. The extremity is neurovascularly intact. PSYCHIATRIC: Normal
affect.

DIAGNOSTIC STUDIES: X-ray of the right tibia/fibula, ankle and foot

J750390       J20875852            **BRYANT,DARNELL D56620 OPTOUT**
06/10/10
show a trimalleolar right ankle fracture.

LABORATORY STUDIES:  Pre-op labs were performed.  CBC is essentially
unremarkable.  Hemoglobin and hematocrit respectively decreased to 13
and 38.  INR is 1.14.  Complete metabolic profile essentially
unremarkable.

EMERGENCY DEPARTMENT COURSE:  Patient is brought to the emergency room
and evaluated by me.  The patient received Toradol 60 mg IM, with good
pain relief.  I have discussed him with Dr. Shiue who has graciously
agreed to accept this patient for admission.

ASSESSMENT:
1. Status post fall.
2. Right trimalleolar ankle fracture.
3. Severe compression skin changes to the anterior lower leg and top
   of the foot secondary to a compressed splint which was placed.

PLAN:  The patient will be admitted for operative repair of the ankle.




JOB#551486
DATE DICT: 06/10/2010 21:39
DATE TRANS: 06/10/2010 23:32
JM:MEDQ/422455885

                          <<SIGNATURE ON FILE>>

                          _____
                          JEFFREY MARINO, M.D.
                          DATE/TIME SIGNED: 06/13/10   1454

R#:0610-0371




28

J750390       J20875852                    CHW CENTRAL CALIFORNIA
BRYANT,DARNELL D56620 OPTOUT               MERCY HOSPITAL BAKERSFIELD
J.5W       J.508-01                        2215 Truxtun Avenue
PAIK,YOUNG                                 Bakersfield, California 93301

Pol #: D56620
DOB: 03/26/65
Admit Date: 06/10/10

                                    OPERATION REPORT

DATE OF OPERATION:

SURGEON:  Young Paik, M.D.
ASSISTANT:
ANESTHESIOLOGIST:  Ken Lee, M.D.

PREOPERATIVE DIAGNOSIS:
1. Displaced trimalleolar fracture right ankle.
2. Destruction distal tibia-fibula syndesmosis.
3. Severe fracture blister of the right lower extremity.

POSTOPERATIVE DIAGNOSIS:
1. Displaced trimalleolar fracture right ankle.
2. Destruction distal tibia-fibula syndesmosis.
3. Severe fracture blister of the right lower extremity.

OPERATION PERFORMED: Debridement of the skin and closed reduction
trimalleolar fracture, application of long-leg cast.

ANESTHESIA:  General.

PROCEDURE:  Under satisfactory general anesthesia, the patient was
placed in supine position on operation table, and right lower extremity
was prepared and draped in the usual manner.  Then skin blister was
debrided and drained with an 11 blade.  Then applied a sterile medicated
dressing.  Then closed reduction attempt in the ankle.  Tried to reduce
anatomical position.  Then visualized the fracture with C-arm
fluoroscope.  Alignment considered improved.  Then applied a long-leg
cast.  The patient tolerated procedure, sent to recovery room in
satisfactory condition.  This patient will be put on IV antibiotics at
least for 24 hours, and then this patient was scheduled for open
reduction internal fixation after improving the skin condition.

JOB#40733
DATE DICT: 06/11/2010 14:52
DATE TRANS: 06/12/2010 07:38
YP:MEDQ/422572213

                         _____
                              YOUNG PAIK, M.D.
                         DATE/TIME SIGNED:

R#:0616-0044

                              29

```
J750390        J20875852
BRYANT,DARNELL D56620 OPTOUT
J.5W        J.508-01
SHIUE,SHYI-TANG
```

CHW CENTRAL CALIFORNIA
MERCY HOSPITAL BAKERSFIELD
2215 Truxtun Avenue
Bakersfield, California 93301

Pol #: D56620
DOB: 03/26/65
Admit Date: 06/10/10

INMATE HISTORY & PHYSICAL

DATE OF ADMISSION: 06/10/2010

REASON FOR ADMISSION: Fracture of right ankle and significant blister over the right ankle area.

HISTORY OF PRESENT ILLNESS: This is a 45-year-old male who is an inmate. The patient had a fall about 3 days prior to admission. The patient was initially sent to Delano ER. The patient was given a cast and then was sent back to prison. The patient was found to have a blister coming out on the skin area with bleeding. The patient was subsequently sent to the Mercy Hospital for evaluation. X-rays showing the ankle fracture and also significant blister and oozing around the skin area. The patient subsequently admitted to the hospital.

REVIEW OF SYSTEMS: CNS: The patient denies acute headache. ENT: There is no history of nasal congestion. CVS: The patient has denied acute chest pain. GI: The patient has a fair appetite. There is no history of nausea or vomiting. GU: The patient denies acute urinary problem. RESPIRATORY: The patient had no acute shortness of breath.

PAST MEDICAL HISTORY: The patient has a history of hypertension, hyperlipidemia and arthritis.

SOCIAL HISTORY: The patient is an inmate.

ALLERGIES: THE PATIENT DENIED.

MEDICATION: The patient is taking aspirin, calcium, Neurontin, hydrochlorothiazide, ibuprofen.

PHYSICAL EXAMINATION: VITAL SIGNS: The patient has a blood pressure 112/74, respiratory rate about 20, heart rate about 80. GENERAL: Well-developed, well-nourished male who appears in no acute distress. HEAD: Atraumatic, normocephalic. Eyes there is no discharge from the nares. CHEST: Symmetric. HEART: Regular breathing sounds clear. ABDOMEN: Soft. EXTREMITIES: There is a significant blister around the right ankle area with significant swelling and right ankle appeared to be swollen secondary to fracture. NEUROLOGIC: The patient is alert.

DIAGNOSTIC DATA: X-ray showed a right ankle fracture. BUN is 18, creatinine 1.23, sodium 134. INR is 1.14. White count 4.7, hemoglobin 11.9, hematocrit 35.

IMPRESSION:
1. Ankle fracture right side.
2. History of diabetes.
3. Significant skin erosion at blister noted and the patient stated that it developed after the fracture and after the cast was placed at the outside hospital.    *30*

J750390        J20875852
BRYANT, DARNELL D56620 OPTOUT
J.5W      J.508-01
PAIK, YOUNG

CHW CENTRAL CALIFORNIA
MERCY HOSPITAL BAKERSFIELD
2215 Truxtun Avenue
Bakersfield, California 93301

Pol #: D56620
DOB:  03/26/65
Admit Date: 06/10/10

ORTHOPEDIC CONSULTATION

**INMATE CONSULTATION**

DATE OF CONSULTATION:

BODY:

REASON FOR CONSULTATION:  This is a 45-year-old gentleman _____
evaluation for by Dr. Shiue regarding his right lower extremity injury.
This patient had a trip-and-fall, states he injured the ankle on June 8,
2010.  After the accident the patient noticed excruciating pain across
the _____; for that reason, the patient was seen at Delano Regional
Hospital, they obtained x-ray films and they did recommend orthopedic
follow-up.  The patient was then sent back to the institute at the Kern
Valley facility.  Then, the patient was transported to Mercy for further
care.  The patient was transferred and admitted by Dr. Shiue and was
referred for orthopedic consultation.

PAST MEDICAL HISTORY:  High blood pressure.  Denied diabetes or gouty
arthritis.

MEDICATIONS:  The patient has been taking medication which was
prescribed by the primary physician at the institute.  The patient
denied _____ first time.  The patient does not drink soft drink.
The patient used to smoke, not any more for the last 15 years.

PHYSICAL EXAMINATION:  Examination on the floor, the patient cooperates
well, but is complaining of pain and soreness in the ankle joint.  It is
not immobilized, and it is splinting.  There are extensive, multiple
_____ blisters of the entire right lower extremity.  Moderately
_____ swollen.

IMAGING STUDIES:  X-ray taken in the emergency room revealed displaced
trimalleolar fracture, widening of the distal tibia/fibula syndesmosis.

CLINICAL IMPRESSION:
1. Displaced trimalleolar fracture.
2. Disruption distal tibia/fibula syndesmosis, right ankle.
3. Severe _____ blister of the right lower extremity and ankle.

TREATMENT/CONSENT/DISPOSITION:  Skin care such as the debridement of the
skin blister, apply medicated dressing, IV antibiotics, then closed
reduction of trimalleolar fracture.. Immobilize cast.

Reschedule for open reduction, internal fixation of trimalleolar
fracture and repair distal tibia/fibula syndesmosis after the improved
skin condition.

31

Mercy Hospital Facility

BRYANT,DARNELL D566   OPTOUT   Unit #: J750390     DOB: 03/26/1965   Age/Sex: 45/M
INMATE CONSULTATION from 06/11/10
Report generated at 06/14/10 07:20                                          Requested by: SPAETH,MARTA

CHW CENTRAL CALIFORNIA
J750390        J20875852              MERCY HOSPITAL BAKERSFIELD
BRYANT,DARNELL D56620 OPTOUT          2215 Truxtun Avenue
J.5W        J.508-01                  Bakersfield, California 93301
PAIK,YOUNG

Pol #: D56620
DOB:  03/26/65
Admit Date: 06/10/10

INMATE CONSULTATION

ORTHOPEDIC CONSULTATION

DATE OF CONSULTATION:

BODY:

REASON FOR CONSULTATION: This is a 45-year-old gentleman _____
evaluation for by Dr. Shiue regarding his right lower extremity injury.
This patient had a trip-and-fall, states he injured the ankle on June 8,
2010. After the accident the patient noticed excruciating pain across
the _____ ; for that reason, the patient was seen at Delano Regional
Hospital, they obtained x-ray films and they did recommend orthopedic
follow-up. The patient was then sent back to the institute at the Kern
Valley facility. Then, the patient was transported to Mercy for further
care. The patient was transferred and admitted by Dr. Shiue and was
referred for orthopedic consultation.

PAST MEDICAL HISTORY: High blood pressure. Denied diabetes or gouty
arthritis.

MEDICATIONS: The patient has been taking medication which was
prescribed by the primary physician at the institute. The patient
denied _____ first time. The patient does not drink soft drink.
The patient used to smoke, not any more for the last 15 years.

PHYSICAL EXAMINATION: Examination on the floor, the patient cooperates
well, but is complaining of pain and soreness in the ankle joint. It is
not immobilized, and it is splinting. There are extensive, multiple
_____ blisters of the entire right lower extremity. Moderately
_____ swollen.

IMAGING STUDIES: X-ray taken in the emergency room revealed displaced
trimalleolar fracture, widening of the distal tibia/fibula syndesmosis.

CLINICAL IMPRESSION:
1. Displaced trimalleolar fracture.
2. Disruption distal tibia/fibula syndesmosis, right ankle.
3. Severe _____ blister of the right lower extremity and ankle. 32

TREATMENT/CONSENT/DISPOSITION: Skin care such as the debridement of the
skin blister, apply medicated dressing, IV antibiotics, then closed
reduction of trimalleolar fracture. Immobilize cast.

Reschedule for open reduction, internal fixation of trimalleolar
fracture and repair distal tibia/fibula syndesmosis after the improved
skin condition

Mercy Hospital Facility

BRYANT,DARNELL D566   OPTOUT   Unit #: J750390      DOB: 03/26/1965  Age/Sex: 45/M
INMATE CONSULTATION from 06/11/10
Report generated at 06/14/10 07:20                                    Requested by: SPAETH,MARTA


J750390        J20875852              BRYANT,DARNELL D56620 OPTOUT

06/10/10
JOB#40707
DATE DICT: 06/11/2010 14:50
DATE TRANS: 06/11/2010 16:23
YP:MEDQ/422571808


                            _____
                            YOUNG PAIK, M.D.
                            DATE/TIME SIGNED:

R#:0611-0320


                                 33

# PACIFIC ORTHOPEDIC
# MEDICAL GROUP

Marshall S. Lewis, M.D., Inc
Young N. Paik, M.D., Inc
Clement O. Alade, M.D., Inc
P. R. Chandrasekaran, M.D, Inc

PATIENT:   Bryant, Darnell                    DATE:   06/28/10
ACCT:      4765
DOB:       03/26/65

Colonial Medical Group
1801 16th St. #B
Bakersfield, CA  93301

Kern Valley State Prison
CDC#: D56620

## PROGRESS NOTE:

The patient was initially seen at Mercy Hospital through Colonial Medical Group
regarding displaced trimalleolar fracture and mild to moderate degree of skin
blister. He had a closed treatment and application of cast. He will be scheduled
for open reduction internal fixation. The patient had IV antibiotics. He returns
to the office for follow up evaluation.

## PHYSICAL EXAMINATION:

Examination after a cast window was made reveals a skin blister on the lateral
aspect with a scant amount of drainage. There is no foul odor. The blister on
the medial side of the ankle has healed.

## RADIOGRAPHIC DATA:

Repeat x-ray reveals a displaced trimalleolar fracture with disruption of the distal
tibiofibular syndesmosis.

## TREATMENT AND RECOMMENDATION:

We will obtain gram stain C&S and CRP. He will be scheduled for open reduction
internal fixation when the skin condition is feasible for surgery.

34

Pacific Orthopedic Medical Group  2619 F Street  Bakersfield, CA  93301   (661) 327-1425  Fax: (661) 325-0837

Re: Bryant, Darnell
June 28, 2010
Page 2

He will return for follow up evaluation in one week.

Young N. Paik, M.D.

/jch

35

# PACIFIC ORTHOPEDIC
# MEDICAL GROUP

Marshall S. Lewis, M.D., Inc
Young N. Palk, M.D., Inc
Clement O. Alade, M.D., Inc
P. R. Chandrasekaran, M.D, Inc

PATIENT:  Bryant, Darnell                    DATE:  07/06/10
ACCT:     4765
DOB:      03/26/65

Colonial Medical Group
1801 16th St. #B
Bakersfield, CA 93301

Kern Valley State Prison
CDC#: D56620

## PROGRESS NOTE:

The patient returns to the office for pre-op evaluation.

## PHYSICAL EXAMINATION:

Examination after removal of the cast, this is hyperemic and a moderate degree of soft tissue swelling. The blister has subsided, except for a small puncture wound in the medial aspect of the distal ankle. There is no evidence of drainage.

## RADIOGRAPHIC DATA:

Repeat x-ray taken in the office, the alignment is almost the same. There is no interval change compared to previous x-ray film. I can visualize the trimalleolar fracture with a moderate degree of displacement as well as widening of the distal tibiofibular syndesmosis. There is generalized demineralized bony structure.

## TREATMENT AND RECOMMENDATION:

The patient will be scheduled for open reduction internal fixation trimalleolar fracture with repair of the distal tibiofibular syndesmosis. Eight weeks after surgery, he will be scheduled for removal of syndesmosis screw.

86

Pacific Orthopedic Medical Group  2619 F Street  Bakersfield, CA 93301   (661) 327-1425  Fax: (661) 325-0837

Re: Bryant, Darnell
July 1, 2010
Page 2

I will order CBC, sed rate, CRP and electrolyte.

Young N. Palk, M.D.

/jch

Addendum:

Previous wound culture revealed pseudomonas aeruginosa sensitive to
Ciprofloxacin and Levofloxacin. The patient will require Ciprofloxacin pre and
post-operatively.

37

BRYANT,DARNELL D56620 OPTOUT    Unit #: J750390    DOB: 03/26/1965  Age/Sex: 45/M

INMATE DISCHARGE SUMMARY from 07/08/10

Report generated at 07/15/10 16:23                                          Requested by: SCHAEFER,SANDRA

CHW CENTRAL CALIFORNIA
J750390        J20921235                  MERCY HOSPITAL BAKERSFIELD
BRYANT,DARNELL D56620 OPTOUT              2215 Truxtun Avenue
J.5W        J.508-01                      Bakersfield, California 93301
MADRILEJO,NELSON

Pol.#: D56620
DOB: 03/26/65
Admit Date: 07/07/10

                            INMATE DISCHARGE SUMMARY

DATE OF ADMISSION:  07/07/2010
DATE OF DISCHARGE:

TRANSFER TO:  Prison infirmary.

ADMISSION DIAGNOSES:
1. Displaced right trimalleolar fracture with disruption of the distal
   tibiofibular syndesmosis.
2. Hypertension.
3. Hyperlipidemia.
4. Degenerative joint disease.

DISCHARGE DIAGNOSES:
1. Displaced right trimalleolar fracture with disruption of the distal
   tibiofibular syndesmosis.
2. Hypertension.
3. Hyperlipidemia.
4. Degenerative joint disease.

PROCEDURE PERFORMED:  ORIF trimalleolar fracture with repair of the
syndesmosis, application of long-leg cast.

CONSULTANT:  Dr. Paik, orthopedic surgery.

HOSPITAL COURSE:  The patient was a direct admit for the above
procedure.  Patient tolerated procedure well.  Patient is awake, alert,
afebrile.  Patient is being evaluated by physical therapy.  Patient may
be discharged.  Patient is clinically stable, may be discharged to the
prison infirmary.

DISPOSITION:  To the infirmary for physical therapy, low-sodium diet.

ACTIVITY:  Activity level is nonweightbearing.  He may ambulate with
physical therapy with crutches.

MEDICATIONS:  He may resume his medicines: Neurontin 800 mg t.i.d.,
hydrochlorothiazide 25 mg daily, Zyrtec 10 mg daily, Prilosec 20 mg
daily, aspirin 80 mg daily, OsCal 500 mg p.o. daily.  He is also on
Tinactin cream, Kenalog cream, Polysporin ointment, Vicodin ES 1 tablet
q.6h. p.r.n. for pain.  He is also on Metamucil 1 packet p.o. 3 times a
day in water, milk of magnesia p.r.n. for constipation, Ultram 50 mg
t.i.d. p.r.n. for pain, Flonase 1 spray intranasally once a day.

FOLLOWUP:  With orthopedic surgery in approximately 2 weeks.

                              38

JOB#124844

Page 1 of 2

Mercy Hospital Facility

BRYANT,DARNELL D56620 OPTOUT    Unit #: J750390         DOB: 03/26/1965 , Age/Sex: 45/M
INMATE DISCHARGE SUMMARY from 07/08/10                                    Requested by: SCHAEFER,SANDRA
Report generated at 07/15/10 16:23

DATE DICT: 07/08/2010 10:15

J750390          J20921235                    BRYANT,DARNELL D56620 OPTOUT

07/07/10
DATE TRANS: 07/08/2010 12:54
NM:MEDQ/425817331

                                    _____
                                    NELSON MADRILEJO, M.D.
                                    DATE/TIME SIGNED:

R#:0708-0216